IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JERRY BROOMS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | No.1:19-cv-02584 |
| v. | ) | |
| | ) | |
| PEAK PROPERTIES, LLC and PARLIAMENT ENTERPRISES, LIMITED, | ) ) | |
| Defendants. | ) | **JURY DEMANDED** |
| | ) ) ) ) | |

## COMPLAINT

1. This complaint alleges that Defendants Peak Properties, LLC and Parliament Enterprises, Limited (collectively, "Defendants") violated the Fair Housing Act by applying an illegal and discriminatory housing admissions policy to applicants of 514-16 West Briar Place, Chicago, Illinois 60657 ("Briar Place"), an apartment building that they own, operate, and manage. Defendants' admissions policy improperly imposes a blanket ban on individuals with misdemeanor convictions. As a result, Defendants' overly broad policy disproportionately impacts African American prospective tenants.

2. Defendants applied that discriminatory admissions policy to Plaintiff Jerry Brooms, Jr. when he was denied a unit at Briar Place solely based on 17-year-old misdemeanor convictions.

3. Mr. Brooms is a 49-year-old African American man who has spent his entire life in Chicago and lived in the Lakeview neighborhood for 15 years.

4. In the summer of 2018, Mr. Brooms began searching for a new apartment in the Lakeview neighborhood. He found an apartment at Briar Place and was excited to submit an application to live there.

5. However, Defendants denied Mr. Brooms' application because he had "criminal activity" including "guilty pleas" and "convictions." Specifically, Defendants rejected Mr. Brooms' application based solely on two 17-year-old misdemeanor convictions and did not take into account any of Mr. Brooms' individual circumstances.

6. When asked for their formal admissions criteria, Defendants refused to provide it. But based on their conduct with respect to Mr. Brooms, it is clear that Defendants will reject prospective tenants if they have misdemeanor convictions within at least the past 17 years. It is also clear that if a prospective tenant has such convictions, Defendants will not consider any individualized evidence about the applicant or his or her circumstances, including the nature and severity of the criminal conduct underlying the convictions, the applicant's good tenant history following the convictions, or evidence of any other rehabilitation efforts.

7. Because African Americans in Chicago have a significantly higher rate of misdemeanor convictions than non-African Americans in Chicago, Defendants' policy has a disproportionate impact on African American applicants, like Mr. Brooms. Here, that improper policy prevented Mr. Brooms—a licensed public safety officer—from being able to live at Briar Place and remain in a neighborhood where he had spent a significant part of his adult life.

8. As a result, Mr. Brooms brings this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*, to prevent Defendants from continuing or renewing their illegal and discriminatory conduct at Briar Place and to redress the harm that Mr. Brooms has suffered as a direct result of Defendants' improper conduct.

## PARTIES

9. Plaintiff Jerry Brooms, Jr. is a 49-year-old African American resident of Chicago, Illinois.

10. Defendant Peak Properties, LLC ("Peak Properties") is a limited liability company headquartered in Chicago, Illinois. Upon information and belief, during all times relevant to the allegations in this complaint, Defendant Peak Properties managed and operated Briar Place.

11. Defendant Parliament Enterprises, Limited ("Parliament") is an Illinois corporation with its principal place of business in Chicago, Illinois. Upon information and belief, Defendant Parliament owns Briar Place.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

13. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants are residents of this district, the subject property that Defendants own, operate, and manage is located in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**A.     Mr. Brooms is a Lifelong Chicago Resident.**

14. Mr. Brooms is a lifelong Chicago resident. He graduated from Fenger Christian High School in 1987 and later earned an electronics certificate from Coyne American Institute and a Servsafe Food Handler certificate from Inspiration Corporation.

15. Over the years, Mr. Brooms has worked in many industries. He has worked as a cook at various fast-food chains, a kitchen assistant at Inspiration Corporation, a meat trimmer at Wexler Meat Company, a stock clerk at Walgreens, and a machine operator at a Chicago Tribune warehouse.

16. In 2015, Mr. Brooms decided to change career paths and enter the field of private security and applied for a Permanent Employee Registration Card ("PERC Card") from the Illinois Department of Financial and Professional Regulation.

17. To obtain a PERC Card, an applicant must demonstrate that he or she meets the requirements for a licensed agency under the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004 (the "Private Security Act"). As part of that process, an applicant must submit security clearance information, including fingerprint information, and submit to a criminal background check.

18. On or around June 6, 2015, the Department of Financial and Professional Regulation found that Mr. Brooms had met the Private Security Act's registration requirements and issued him a PERC Card. Mr. Brooms has held a valid PERC Card ever since.

19. Since obtaining his PERC Card, Mr. Brooms has worked as an unarmed security guard for U.S. Security Associates, Inc. and a public safety office for Andy Frain Services. In those roles, Mr. Brooms performed safety, loss prevention, and foot patrol duties at a variety of locations, including the Water Tower Place shopping mall and Wrigley Field, the Chicago Cubs baseball stadium visited by millions of people each year.

20. Since May 2018, Mr. Brooms has been employed by SDI Security, Inc. as a residential security officer at a North Side senior living center.

**B.     Defendants Improperly Rejected Mr. Brooms' Rental Application.**

21.     For nearly 15 years—from 2004 to 2018—Mr. Brooms lived in a single-room-occupancy apartment in the Lakeview neighborhood of Chicago.  Although Mr. Brooms loved the Lakeview neighborhood, and particularly how safe it was, he felt that he had outgrown his small apartment and wanted to move into a larger unit.

22.     In 2014, Mr. Brooms applied for a Housing Choice Voucher ("HC Voucher") from the Chicago Housing Authority (the "CHA") to help him afford to move into a larger apartment.

23.     On or around August 10, 2018, the CHA notified Mr. Brooms that he had been approved for a HC Voucher, which would expire on December 7, 2018.  Mr. Brooms immediately began searching for a new, larger apartment in the Lakeview neighborhood.

24.     On or around August 21, 2018, Mr. Brooms found an online apartment listing for Unit 1-A at Briar Place.  Mr. Brooms liked the apartment listing and immediately called Defendant Peak Properties to obtain more information about the unit.

25.     He spoke with an office representative named Rosemarie and informed her that he was interested in Unit 1-A and that he would be paying part of his rent with his HC Voucher.  The representative instructed Mr. Brooms to call Ms. Leticia Schoewe, an employee of Defendant Peak Properties.

26.     On or about, Mr. Brooms toured Unit 1-A.  Mr. Brooms thought the unit was perfect and that it fit his desire for a larger apartment in the neighborhood he had called home for so many years.  After the tour, Rosemarie instructed Mr. Brooms to contact Ms. Schoewe to apply to rent the apartment.

27.     Mr. Brooms called Ms. Schoewe and explained to her that he was interested in Unit 1-A at Briar Place and that he was a HC Voucher holder.  Ms. Schoewe did not raise any issue with respect to Mr. Brooms' HC Voucher.

28. On or around September 10, 2018, Mr. Brooms applied for the apartment online via Defendant Peak Properties' website and paid a $250 administrative fee and an application fee.

29. On September 14, 2018, Ms. Schoewe sent Mr. Brooms an e-mail that stated, "At this time, we are not able to accept your application due to criminal records." No other reason was included in Ms. Schoewe's e-mail to Mr. Brooms regarding the rejection of his application. A true and correct copy of Ms. Schoewe's September 14, 2018 e-mail is attached as Exhibit 1.

30. Ms. Schoewe's e-mail further stated, "I have requested accounting to refund you your $250.00 admin fee."

31. After receiving this e-mail, Mr. Brooms called Ms. Schoewe to find out precisely why his application had been rejected. During that call, Ms. Schoewe refused to provide any further detail regarding the reason that his application was rejected. She told Mr. Brooms that he could pick up a copy of his screening report from Defendant Peak Properties' office located at 2815 West Roscoe Street, Chicago, Illinois 60618.

32. On or about September 17, 2018, Mr. Brooms went to Defendant Peak Properties' office to pick up a copy of his screening report (the "Screening Report"). While at Defendant Peak Properties' office, Mr. Brooms saw Ms. Schoewe and again asked her why his application had been rejected. Again, she would not provide any further detail.

33. The Screening Report states, under the heading "Reasons for Result:", "Criminal History Does Not Meet Property Requirements."

34. In the "Premium National Criminal Records Search" section, the screening Report identifies three records.

35. The first record listed is an August 23, 2012 arrest for "THEFT OF LOST/MISLAID PRO." It is listed as a misdemeanor and does not reflect a guilty plea or conviction.

36. The second record listed is "CRIMINAL TRESPASS TO LAND" a "CLASS B MISDEMEANOR" with a "Disposition Date" of April 4, 2001. This record shows a guilty plea and lists the "Disposition" as "REVOCATION/VACATE/CONDITIONAL DISCHARGE."

37. The third record listed is "DISORDERLY CONDUCT" a "CLASS C MISDEMEANOR" with a "Disposition Date" of April 4, 2001. This record shows a guilty plea and lists the "Disposition" as "REVOCATION/VACATE/CONDITIONAL DISCHARGE."

38. On September 17, 2018, in response to an e-mail he had sent to Ms. Schoewe referencing the 2016 HUD guidance relating to the use of criminal records by housing providers, Mr. Brooms received an e-mail from Marvin Husby of the Law Offices of Marvin Husby. A true and correct copy of Mr. Husby's September 2018 e-mail to Mr. Brooms is attached as Exhibit 2.

39. In that e-mail, Mr. Husby identified himself as counsel to Defendants and wrote that Mr. Brooms' background check "contains criminal activity where there are guilty pleas and convictions" and that "the denial of [his] application was appropriate."

40. In a September 19, 2018 e-mail, Mr. Husby sent Mr. Brooms another e-mail in which Mr. Husby wrote: "Your application has been properly considered and denied under all State, Federal and local laws. . . .This matter is now closed." A true and correct copy of Mr. Husby's September 19, 2018 e-mail to Mr. Brooms is attached as Exhibit 3.

41. Two days later, on September 21, 2018, Defendant Peak Properties sent Mr. Brooms an adverse action notice letter concerning its rejection of his rental application.

42. That letter stated: "Your rental application has been declined because you . . . did not meet the property's minimum rental requirements." The letter did not identify any of the "property's minimum rental requirements."

43. On October 10, 2018, Mr. Brooms' counsel sent Mr. Husby a letter requesting "a copy of Peak Properties 'minimum rental requirements' including without limitation its policy with respect to the evaluation of applicants with a criminal history and what criteria are used."

44. Neither Mr. Husby nor anyone else from Defendants Peak Properties or Parliament provided Mr. Brooms or his counsel with the requested information.

**C.    Defendants' Actions Caused Mr. Brooms Significant Stress and Forced Him to Move into a Less Desirable Apartment.**

45. Around the end of September 2018, knowing that he needed to find a new apartment or lose his HC Voucher, Mr. Brooms resumed his housing search.

46. Defendants' denial of Mr. Brooms' application caused him significant emotional distress. After receiving his rejection notice, Mr. Brooms realized that he would not be able to rent the unit at Briar Place and that he was running out of time to find a new apartment before his HC Voucher expired.

47. After spending 15 years of his life in the Lakeview neighborhood, it was inconceivable to Mr. Brooms that he would be unable to remain in that neighborhood due to two 17-year-old misdemeanor convictions. But Mr. Brooms was unable to locate another suitable apartment in Lakeview. As a result, instead of moving to a better apartment in the neighborhood he loved, Defendants' actions forced him to leave Lakeview.

48. On or around November 27, 2018, shortly before his HC Voucher was set to expire, Mr. Brooms found and ultimately moved into a unit in the Albany Park neighborhood of Chicago, where he currently resides. Mr. Brooms greatly preferred the unit at Briar Place

because of its location in the Lakeview neighborhood and proximity to his job. His current apartment is in a less desirable neighborhood and requires him to commute an additional 30-45 minutes to and from work.

**D.      Defendants' Rejection of Mr. Brooms' Application Constitutes Unlawful Discrimination.**

49.     The Fair Housing Act prohibits housing policies that appear to be neutral on their face but have a disparate impact on the basis of race, unless such policies are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice.

50.     Defendants' housing admissions policy as applied to Mr. Brooms is unlawful under this standard because it imposes a complete ban on individuals with misdemeanor convictions within the past 17 years and fails to consider an applicant's individual circumstances. Such housing bans have a significant disparate impact on African Americans. Any legitimate safety concerns can be satisfied through the less discriminatory alternative of providing a shorter look-back period and/or by providing individualized consideration to each applicant's circumstances and suitability as a tenant.

**1.      African Americans represent a disproportionate portion of those affected by mass incarceration.**

51.     Over the past four decades, the U.S. prison population has exploded from about 300,000 incarcerated individuals to more than 2 million.[1] This massive increase was the result of law enforcement and criminal justice policies and practices that impacted racial and ethnic groups in different ways with a profound effect on African Americans who represent an

---

[1] *See* U.S. Dep't of Justice, *Prisoners in 1980* (1981), https://www.bjs.gov/content/pub/pdf/p80.pdf; U.S. Dep't of Justice Bureau of Justice Statistics, *Correctional Populations in the United States, 2016*, tbl. 1 (2018), https://www.bjs.gov/content/pub/pdf/cpus16.pdf.

9

overwhelmingly disproportionate portion of those affected by mass incarceration.[2] For example, while African Americans only constitute 13.3 percent of the general population in the United States,[3] they account for 33.4 percent of the national prison population.[4]

52. In Illinois, the disproportionate incarceration rate of African Americans is even more significant. African Americans make up around 14.5 percent of the Illinois population[5] but constitute 56.2 percent of the state's prison population and 59.1 percent of its parole population.[6]

### 2. In Chicago, African Americans are arrested, subjected to police stops, and convicted of misdemeanors at higher rates than any other racial group.

53. In Illinois, an African American person is nine times more likely to go to prison than a White person.[7] Despite making up one-third of Chicago's population, African Americans constitute nearly three-quarters of the city's arrests and more than two-thirds of the individuals held at Cook County Jail.[8] Additionally, African Americans are subjected to the vast majority of the police stops performed in the Chicago area.[9]

54. In Cook County, African Americans constitute 24 percent of the population but 60 percent of the County's misdemeanor dispositions.[10] Whites, in contrast, constitute 57 percent of the County's population but only 24 percent of its misdemeanor dispositions.[11]

---

[2] *See generally* Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2012).
[3] U.S. Census Bureau, *Statistical Abstract of the United States: 2012*, (2012), https://www2.census.gov/library/publications/2011/compendia/statab/131ed/2012-statab.pdf.
[4] *See generally*, U.S. Dep't of Justice, *Corrections Statistical Analysis Tool (CSAT) - Prisoners*, Prisoner Characteristics (Age, Sex, Race, Offense) (2016), https://www.bjs.gov/index.cfm?ty=nps.
[5] U.S. Census Bureau, *supra* note 3, at 24.
[6] Ill. Dep't of Corrections, *Fiscal Year 2017 Annual Report*, 79, 82 (2017).
[7] Henricks, Kasey, et al., *A Tale of Three Cities: The State of Racial Justice in Chicago*, 112 (Inst. Res. Race & Pub. Pol'y 2017).
[8] *Id.* at 7-8; *Chicago Police Department Annual Report 2017*, 82 (2017), https://home.chicagopolice.org/wp-content/uploads/2019/03/Chicago-Police-Department-Annual-Report-2017.pdf.
[9] Am. Civ. Liberties Union of Ill., *Stop and Frisk in Chicago*, 9 (2015).
[10] Ill. Sentencing Pol'y Advisory Council, *Misdemeanor Sentencing: Trends And Analysis*, 20-21 (2018), http://www.icjia.state.il.us/spac/pdf/SPAC_Misdemeanor_Report_2018_101818.pdf.
[11] *Id.*

55. African Americans in Cook County were convicted of misdemeanors at a rate of 59 percent, which is higher than any other racial group.[12] African Americans also had twice the number of prior arrests and 1.7 times the number of convictions as Whites.[13]

56. As a result, African Americans are far more likely than any other racial group to be affected by Defendants': (1) overly broad look-back period applied to individuals with misdemeanor convictions; and (2) failure to conduct an individualized assessment for applicants with a criminal history.

### 3. Defendants' policy fails to comply with HUD's Guidelines.

57. In 2016, the Office of General Counsel for HUD issued Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate Transactions ("HUD Guidelines"). A true and correct copy of the HUD Guidelines is attached as Exhibit 4.

58. Using the well-established discriminatory effects or "disparate impact" framework and after considering arrest and conviction data, incarceration rates, and the disproportionate representation of African Americans and Hispanics in the criminal justice system, HUD cautioned that arbitrary and overly broad criminal-history-related bans would have an unjustified discriminatory effect.

59. HUD's Guidelines also provide that admission policies should consider each application individually and consider, among other things, whether the applicant's offense bears a relationship to the safety and security of other residents, the level of violence the offense involved, the length of time since the conviction, the number of convictions that appear in the

---

[12] *Id.* at 21.
[13] *Id.* at 23.

applicant's criminal history, and any rehabilitation efforts that the applicant has undertaken since the time of conviction.

60. Defendants' housing admissions policy, which imposes a blanket ban on individuals with misdemeanor convictions in the past 17 years, fails to meet HUD's Guidelines.

61. Defendants' housing admissions policy prevents Briar Place applicants with prior misdemeanor convictions from presenting evidence of individualized circumstances. Defendants do not consider the individual circumstances of an applicant with prior misdemeanor convictions when deciding whether to accept or reject the applicant's housing application.

62. As a result, Defendants' housing admissions policy has a disparate impact on the basis of race because applicants are excluded from opportunities due solely to the existence of prior misdemeanor convictions, regardless of whether they actually pose a current safety risk.

## CAUSES OF ACTION

### COUNT I
### Disparate Impact in Violation of the Fair Housing Act, 42 U.S.C. § 3604

63. Plaintiff Jerry Brooms, Jr. repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 62 above.

64. The federal Fair Housing Act makes it unlawful, among other practices, to "otherwise make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

65. It is also unlawful under the Fair Housing Act to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

66. By categorically rejecting all applicants who have misdemeanor convictions within 17 years of their application submission without considering those applicants' individualized circumstances, Defendants' housing admissions policy provides different "terms, conditions, or privileges" of rental housing and also has the effect of "otherwise mak[ing] unavailable or deny[ing] a dwelling" on the basis of race. Even if Defendants' blanket ban related to any valid interest in disqualifying certain applicants with prior misdemeanor convictions, there are less discriminatory alternatives available in determining applicant eligibility for housing at Briar Place that would serve the same purpose.

67. Defendants' conduct has an adverse and disproportionate impact on African Americans in Chicago as compared to similarly situated Whites. This adverse and disproportionate impact is the direct result of Defendants' policy that imposes an overly broad 17-year-look-back period to individuals with misdemeanor convictions and fails to conduct an individualized assessment of such applicants.

68. The application of Defendants' housing admissions policy harmed Mr. Brooms, an African American Chicago resident, by denying him housing, causing him to suffer emotional distress, and causing him to incur out-of-pocket costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jerry Brooms, Jr. respectfully requests that this Court grant him the following relief:

(1) Enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 3604;

(2) Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by Defendants' conduct alleged herein;

(3) Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2);

(4) Award pre- and post-judgment interest to Plaintiff, as provided by law; and

(5) Order such other relief as this Court deems just and equitable.

**DEMAND FOR A JURY TRIAL**

Plaintiff Jerry Brooms, Jr. demands a jury trial on all issues properly triable by a jury.

Dated: April 16, 2019          Respectfully submitted,

**JERRY BROOMS, JR.**

By: /s/ Andrew D. Shapiro
By one of his Attorneys

Andrew D. Shapiro
Abigail F. Chin (*pro hac* to be submitted)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
321 North Clark Street, Suite 400
Chicago, IL 60654
(312) 756-8500
ashapiro@porterwright.com
achin@porterwright.com

Aneel L. Chablani
Barbara R. Barreno-Paschall
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
100 North LaSalle Street, Suite 600
Chicago, IL 60602
(312) 630-9744
achablani@clccrul.org
bbarreno-paschall@clccrul.org

Attorneys for Plaintiff Jerry Brooms, Jr.